[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE TEMPORARY INJUNCTION
Plaintiff, which is sometimes known as PNS, brings this action to enforce certain contract rights against its former employee, Gerald Brooks (Brooks), and his present employer WVIT, Inc. (WVIT).
Facts
Plaintiff owns a television station known as WFSB and as Channel 3. Defendant WVIT, Inc., a Delaware corporation, owns a television station known as WVIT and as Channel 30. It has a place of business in West Hartford, Connecticut. The two CT Page 2787 stations directly compete for viewers and advertising revenues.
Brooks was employed by plaintiff as an anchor and reporter at WFSB from 1979 to December 1, 1993. On June 8, 1984 he entered into a contract (1984 Contract) with plaintiff. In Paragraph 3 of the cover letter portion of that contract it was agreed:
 At the conclusion of this contract agreement, WFSB shall have the right of first refusal for your services providing the station agrees to match a bona fide offer from another company. Regardless of whether or not we choose to exercise our right of first refusal, you agree not to accept any offer from any competing station as outlined in the attached Talent Contract Clauses.
The same language appears in Paragraph 3 of a May 20, 1987 and a November 30, 1987 cover letter to contracts. In the 1984 Contract, Brooks and plaintiff also agreed, in Paragraph 6 of the Talent Contract Clauses portion of the contract, that:
EXCLUSIVE USE OF NAME; NON-COMPETITION; FIRST REFUSAL
 (a) [e]mployee hereby grants to PNS, during the Term plus sixty (60) days immediately following expiration or termination of the Agreement, the exclusive right to use and license others to use Employee's name, voice, sobriquet, biography, recorded performance, picture, portrait, caricature and/or likeness for advertising, promotion and publicity purposes pertaining to the services Employee is to render under the Agreement.
 (b) In consideration of the compensation terms to which PNS has committed and the promotional efforts and expenditures PNS will devote to Employee's services under the Agreement, Employee agrees that in the event the Agreement is terminated prior to its expiration or upon its expiration, for a period of sixty (60) days subsequent to such termination or expiration, Employee will not provide Employee's on-air services to any television station, the main transmitter of which is situated within either Hartford, Litchfield, Middlesex, New Haven, New London or Tolland county, Connecticut, or within Franklin, CT Page 2788 Hampden, or Hampshire County, Massachusetts, all of such television stations being referred to hereinafter collectively as "Other station" except a television station owned or controlled by PNS.
 (c) Unless the Agreement is terminated by PNS pursuant to paragraph 2(b) or paragraph 8 of these clauses, for a period of six (6) months subsequent to any termination or the expiration of the Agreement,
 Employee shall not furnish nor agree to furnish his or her on-air services to any other Station without first giving PNS the opportunity to enter into an agreement for Employee's on-air services on terms and conditions at least as favorable to PNS as those offered to Employee by any other Station (which Employee is willing to accept) or offered by Employee to any Other Station (which it is willing to accept) regardless of whether such offer was first made or received prior or subsequent to termination or expiration of the Agreement. PNS shall have twenty (20) days from the date of receipt of written advice from Employee of any such other offer (containing full details in regard thereto) together with Employee's written affirmation of the offeree's willingness to accept the same) in which to accept or reject such other offer. If PNS accepts the same, PNS shall not be required to satisfy any provision contained in such other offer which cannot be satisfied by payment of money to Employee. Only if PNS rejects such other offer or fails to accept the same within the time above specified shall Employee be free to furnish or agree to furnish the Other Station Employee's on-air services on terms and conditions no less favorable to Employee than the terms contained in Employee's last offer to PNS. If Employee does not accept such other offer, this Paragraph 6(c) shall apply to any subsequent such other offer received by or made to Employee within said six months period.
By contracts dated May 20, 1987 and November 30, 1987 (1987 Contracts), Brooks and plaintiff agreed to similar terms as quoted above from the 1984 Contract. The only difference is that Paragraph 6(b) of the 1987 Talent Contract Clauses portion of the 1987 Contracts substitute the words "for a period of six (6) CT Page 2789 months" for the words "for a period of sixty (60) days."
By a contract dated November 9, 1990 (1990 Contract), Brooks and plaintiff agreed in Paragraph 4 of the cover letter portion of that contract that:
 [u]pon the expiration of this agreement, the station shall have non-competition and first refusal rights in accordance with the attached Talent Contract Clauses. (emphasis added)
Plaintiff's news director Mark Effron (Effron) negotiated that contract with Brooks. It was written by plaintiff. Brooks was not represented by an attorney during any of those 1990 negotiations nor at the signing of that contract.
That 1990 Contract also provides that "[t]he Agreement comprised of the covering letter and these Talent Contract Clauses, contain the entire understanding of the parties thereto relating to the subject matter contained therein, and the same may not be amended, modified or terminated orally." At the time of execution of the 1990 Contract plaintiff and Brooks intended that it comprise the entire agreement between them regarding Brooks' employment. They further intended that it contain all of the agreements between them regarding the covenant not to compete (Covenant) and first refusal rights (Rights).
At the direction of plaintiff's attorney, the quoted language from paragraph 3 of the letter agreement portion of the 1987 Contract was deleted, and different language was inserted in paragraph 4 of the letter agreement portion of the 1990 Contract.
Paragraph 4 of the letter part of the 1990 Contract says that "[u]pon the expiration of this agreement, the Station shall have non-competition and first refusal rights in accordance with the attached Talent Contract Clauses." Paragraph 6 of those Talent Contract Clauses is identical to that in Paragraph 6 of the Talent Contract Clauses portion of the 1987 contracts.
Under the 1990 Contract, Brooks was an employee of plaintiff for the period December 2, 1990 through December 1, 1993, when his employment contract with plaintiff expired. During that period he performed all of his contract duties in a satisfactory manner. CT Page 2790
Under the 1990 Contract Brooks recognized that he was rendering unique and personal services; that he would cause plaintiff irreparable harm if he violated the contract, and that plaintiff would have the right to injunctive relief for violations of that contract.
Stephen Schwaid (Schwaid) has been employed as the news director of WVIT since early May 1992.
Between late 1992 and June 1993, Brooks and Schwaid had a series of meetings concerning the possibility of Brooks' employment with WVIT.
By April 1993, WVIT's attorneys had received a copy of the 1990 Contract, from Schwaid.
After Brooks provided Schwaid with a copy of the 1990 Contract, Brooks did not discuss the Covenant with Schwaid or Alfred Bova (Bova), who was and is the Vice President and General Manager of WVIT until August 21, 1993. Schwaid reports to Bova.
Brooks did not discuss paragraphs 6(a) and 6(b) of the 1990 Contract with Schwaid prior to August 17, 1993.
WVIT gave a letter of August 13, 1993 to Brooks (Exhibit C) and asked him to show it to Christopher Rohrs (Rohrs), the Vice President and General Manager of WFSB by August 20, 1993, which he did. That letter is a written offer of employment from WVIT to Brooks and set out Brooks' proposed duties and compensation.
That offer was conditioned on WFSB not exercising its right of first refusal, and provided as follows:
 It is expressly understood that this agreement is conditioned upon your current employer, WFSB not matching the terms and conditions set forth herein by September 9, 1993. You agree to present this agreement to WFSB no later than August 20, 1993, in order to provide WFSB with the right to match the terms and conditions hereof. In the event WFSB does match the terms and conditions hereof prior to September 12, 1993, then this agreement will be deemed null and void and you will not be employed by WVIT on the terms and conditions set forth herein. CT Page 2791
On August 20, 1993, Brooks delivered a letter (Exhibit D) to Rohrs stating his willingness to accept WVIT's offer and formally notifying plaintiff of their opportunity to match WVIT's offer. But plaintiff decided not to match that offer and on that day Rohrs told Brooks of that decision.
There was no discussion about the Covenant between Rohrs and Brooks at the delivery of either Exhibit C or D nor was there discussion about any possible interplay between Paragraphs 6(a), 6(b), and 6(c) of the 1990 Contract.
On August 21, 1993 WVIT wrote Brooks a letter (Exhibit E) and on August 29, 1993, Brooks presented it to Rohrs. At that time there was no mention of the Rights or the Covenant.
On August 21, 1993, Brooks executed a contract of employment with WVIT (WVIT Contract) which set out the duties and salary of Brooks. The WVIT Contract was conditioned on WFSB not exercising its right of first refusal, and provided as follows:
 It is expressly understood that this agreement is conditioned upon your current employer, WFSB not matching the terms and conditions set forth herein by September 9, 1993. You agree to present this agreement to WFSB no later than August 20, 1993, in order to provide WFSB with the right to match the terms and conditions hereof. In the event WFSB does match the terms and conditions hereof prior to September 9, 1993, then this agreement will be deemed null and void and you will not be employed by WVIT on the terms and conditions set forth herein.
On August 23, 1993, Brooks delivered a copy of the WVIT Contract to Rohrs.
Thereafter, on August 23, 1993, Effron distributed a memo at WFSB announcing that Brooks would be leaving WFSB to work at WVIT.
Brooks began working for defendant, WVIT, Inc. on December 2, 1993.
During the negotiations with WVIT, Inc., Brooks was represented by counsel. CT Page 2792
During the week beginning Monday, August 23, 1993, Effron told Brooks that plaintiff intended to enforce the Covenant.
In response to Effron's statement that plaintiff intended to enforce the Covenant, Brooks responded "then I would assume that Al Terzi won't be on the air for an entire year."
Between August 1993 and December 1, 1993, Effron brought up the Covenant with Brooks three or four times.
In response to Effron's three or four statements that plaintiffs intended to enforce the Covenant, Brooks never took the position that there was no covenant to enforce because WFSB failed to exercise the right of first refusal.
One of the terms of Brooks' contract with WVIT, Inc., Brooks is a six-month non-competition provision which prevents him from rendering "any on-air services in any capacity whatsoever" at the conclusion of his employment with WVIT.
Under the terms of the WVIT Contract, Brooks and WVIT, Inc. agreed that, so long as Brooks was not in breach of the WVIT Contract, WVIT would indemnify Brooks
 "with respect to the reasonable costs of defending any lawsuit brought against you by WFSB and/or Post-Newsweek which alleges: (a) you have failed to provide WFSB with the right to match the terms and conditions of this Agreement, or (b) if you are in breach of the covenant not to compete in Paragraph 6(b) as set forth in your current Agreement with WFSB, a copy of which is attached hereto, which you warrant and represent is the full and complete Agreement between you and WFSB."
Under the terms of the WVIT Contract, Brooks and WVIT, Inc. further agreed that WVIT will employ Brooks to render exclusive services, including on-air services no later than June 3, 1994.
Further, under the terms of the WVIT Contract, Brooks is to be employed by WVIT for a three (3) year period commencing on December 2, 1993, during which he is to be paid an extra $1,000 for each week of that three (3) year period in which he is scheduled to render on-air services and does not render on-air CT Page 2793 services on the 6:00 p.m., 10:00 p.m. or 11:00 p.m. news program except for the period between December 2, 1993 and June 3, 1994.
Brooks did not request that WVIT not use his services on the air for the six (6) month period between December 2, 1993 and June 3, 1994.
As of August 1993, WVIT wanted to put Brooks on the air as soon as possible.
WVIT was aware of the six-month non-competition clause in the 1990 Contract when it executed the WVIT Contract on August 21, 1993.
Brooks has been gainfully employed by WVIT since December 2, 1993 and is being compensated at the full rate agreed to in the WVIT Contract.
Brooks had no period of unemployment between the time he left Channel 3 and the time he started at WVIT.
Brooks appeared on the United Negro College Fund (UNCF) Telethon promotions televised on WVIT during the period from December 12, 1993 to January 9, 1994.
On January 8, 1994, Brooks appeared as a co-host on the UNCF Telethon which aired on WVIT, Channel 30. The court cannot find that plaintiff was harmed in any manner by that appearance.
During the period in which Brooks appeared on UNCF promotions on WVIT, the average ratings for the plaintiff's news increased.
WFSB carries more news anchor personnel than its competitors in the market.
WFSB possesses adequate staffing to conduct its news broadcast at the present time.
There is no direct evidence that WFSB would be harmed if Brooks were to appear as a news anchor on WVIT.
At the time of the expiration of the 1990 Contract and thereafter, plaintiff never intended to "promote" Brooks as permitted by the 1990 Contract in any manner. CT Page 2794
Nothing prevented it from promoting Brooks during the 60 days following the termination of his employment with plaintiff.
Brooks is a potential competitor to WFSB only in the area of WFSB's news broadcasting and programs immediately following news programs.
If Brooks were prohibited from performing any on-air services for WVIT, that would include work in on-air capacities in which he poses no competitive threat to plaintiff and in which he does pose a competitive threat.
In July 1989 WFSB hired Al Terzi (Terzi) as a news anchor under a five-year contract. His employment with WFSB began on January 1, 1994. He will perform multiple significant news broadcasts.
Terzi had been at Channel 8. Terzi has not appeared on Channel 3's air since he left Channel 8.
Even if Terzi were to appear on Channel 3, Brooks' appearance on Channel 30 would allow Brooks to transfer the profile he developed while on Channel 3 to Channel 30. Terzi has news-anchor skills comparable to Brooks but he ranks higher in public recognition.
At the time of the termination of Brooks' employment at WFSB, his salary was lower than any of the main anchors at WFSB.
It is plaintiff's expectation that if Terzi appears as a news broadcaster opposite Brooks, the net effect will be a gain of viewers for WFSB.
Since the expiration of Brooks employment with WFSB, WFSB has made the following assignments of its skilled news-anchors:
Weekend: Jeffrey Cole
 Early Morning: Dennis House Virginia Cha
Noon: Gayle King
 5:00 Don Lark Janet Peckinpaugh CT Page 2795
5:30 Gayle King
 6:00 Don Lark Janet Peckinpaugh
 11:00 Don Lark Denise D'Acenzo
Brooks did not give WVIT copies of any of his employment contracts with plaintiff predating the 1990 Contract.
A potential harm identified by plaintiff resulting from Brooks' employment for WVIT is loss of viewers and a resulting decrease in advertising revenues. Such a loss cannot be calculated with precision by research from Nielsen ratings even though there is a positive correlation between such ratings for news programs and advertising revenue.
One of Brooks' objectives at WVIT is to raise the Nielsen ratings for those news programs on which he will appear.
Between 1992 and August 21, 1993, Brooks attended 10 to 13 meetings concerning the possibility of his employment with WVIT.
At no time in any meeting with either Schwaid or Bova did Brooks say that when he went to work for WVIT he wanted to take six months off the air.
Neither Bova nor Schwaid ever told Brooks that, when Brooks went to work for WVIT either wanted to keep him off the air for six months.
By contract Brooks was to begin appearing on WVIT news programs no later than June 3, 1994.
In mid- to late-November 1993, in a telephone conversation, Schwaid told Brooks to ask plaintiff whether it intended to enforce the covenant not to compete.
In late November 1993, Brooks asked Rohrs whether plaintiff intended to enforce the non-competition clause and Rohrs referred Brooks to Mr. Branson (Branson), an employee of plaintiff, and Branson told Brooks that plaintiff intended to enforce the Covenant. Brooks responded, "Okay". CT Page 2796
When Brooks discussed with Branson plaintiff's intention regarding the enforcement of the Covenant, Brooks did not raise any question about the enforceability of the Covenant in light of the Rights.
After talking to Branson and learning that plaintiff was inclined to enforce the covenant Brooks called Schwaid to tell him what Branson had said and Schwaid said, "Okay", or something to that effect.
Plaintiff's intention with regard to the Covenant was important to WVIT in November 1993 but Schwaid did not ever discuss specifics of the Covenant with Bova.
The first time Brooks took the position that WFSB's failure to exercise the right of first refusal meant that the Covenant was unenforceable was after the legal proceedings began.
Before December 21, 1993 Brooks had never communicated to plaintiff his position that its failure to exercise the Rights made the Covenant unenforceable.
Brooks said he did not know why the date June 3, 1994 was selected for his on-air appearance.
Brooks said did not read the 1990 Contract before he signed it.
With the departure of Van Hackett, a news-anchor at Channel 30, WVIT would have only one or possibly two main anchors.
By August 1993, Schwaid knew that WVIT was not going to renew Van Hackett's contract.
WVIT stopped searching for another main anchor on August 23, 1993.
Before hiring Brooks, WVIT had research done on the public's perception of news anchors. Of the eight news anchors covered in the study, Brooks was rated in the top half.
One of Schwaid's functions as the News Director of WVIT is to improve the ratings to the highest point possible.
Schwaid is of the opinion that the addition of Brooks will improve WVIT's ratings because "Gerry is very credible. He's CT Page 2797 well liked. He's got a great personality. He knows journalism. He knows the State of Connecticut, and he will work very well with Jo-Ann Nesti." Because of research available to WVIT, according to Schwaid, the business purpose of a covenant not to compete for a news anchor person is to protect the investment made in the anchor person within the market.
Advertisers pay attention to Nielsen ratings in determining what they are willing to pay for advertising spots.
At some time between November 1, 1993 and December 2, 1993, WVIT made a decision not to use Brooks as an anchor beginning December 2, 1993.
The June 3, 1994 date for Brooks' appearance was inserted in Exhibit E by WVIT before Schwaid ever saw the 1984 and 1987 Contracts.
Part of Bova's job as the General Manager of Channel 30 is to improve the Nielsen ratings for Channel 30's programs.
According to Bova, you need an anchor of Brooks' stature to improve Channel 30's ratings.
If Brooks' appearance on the air resulted in viewers transferring allegiance from Channel 3 to Channel 30, Channel 3 would be harmed.
The business purpose for noncompetition clauses in anchor contracts is as follows:
 Television stations make a substantial investment in the profile of their anchor people. When an anchor leaves a television station to begin work at another station in the same market and that profile is fully intact, if that anchor immediately appears in a newscast format, the profile will transfer to the other station so the theory is that there should be some buffer period in between.
Computer analysis done by Channel 3 of the information shown on Exhibit S determined that the gross household impressions for the programming schedule shown by Exhibit S exceeded 4 1/2 million.
Based upon the November 1993 Nielsen sweeps ratings, Brooks' CT Page 2798 appearance in the Channel 30 news at 6:00 p.m. and 11:00 p.m. would have been part of the approximately 650,000 gross household impressions per week which the 6:00 p.m. and 11:00 p.m. Channel 30 news made in December 1993.
Channel 3 would suffer loss of viewers and advertising revenue if Brooks were to appear on Channel 30 on the news set as an anchor before June 3, 1994 because if an anchor leaves one television station with his profile as an anchor fully intact and is seen immediately on another station in that market in a newscast capacity, then the profile will transfer from the first station to the other.
Another potential harm identified by plaintiff resulting from Brooks' employment for WVIT is the transfer of the profile of Brooks' WFSB anchor position to WVIT. There is no direct evidence that Brooks transferred the reputation, credibility or profile of his Channel 3 anchor position to WVIT but Channel 3 would suffer as a result of Brooks' appearance as an anchor on Channel 30 before June 3, 1994, although the damage is not quantifiable with mathematical precision. This is so because it is hard to evaluate the impact of Brooks' appearance on Channel 30 when considered with the actions of other competitors; the effect of lead-in programs; and the effect of follow-up programs.
News programs' ratings affect ratings in other television programs as well.
WVIT did not act fraudulently or with malice in its employment or utilization of Brooks nor did it engage in any acts of intimidation in connection with his employment.
The court finds that neither the geographical nor temporal restraints imposed by the Covenant are unreasonable.
Law
Plaintiff now seeks a temporary injunction and therefore has the burden of proof to convince the court that it has no adequate remedy at law; it is being or will be irreparably and substantially injured; it is more likely to prevail on the trial in which it seeks the permanent injunction; and that upon a balancing of the equities it is more entitled to a judgment than defendants. Griffin Hospital v. Commission on Hospitals Health Care, 196 Conn. 456-458.[1]
CT Page 2799
However, cases involving restrictive covenants do not require the existence of damages. Hartford Electric Light Co. v. Levitz,173 Conn. 15, 20.
I. The court is convinced that plaintiff has no adequate remedy at law simply because Brooks is unique. Anchors are not fungible. In addition, computation of damages is entirely too speculative.
II. Although not necessary at this point, plaintiff has shown that its injury is likely to be irreparable and substantial.
III. In regard to balancing the equities among the parties, we have at least three to consider. Clearly, plaintiff is being and will be harmed.
The court might quickly conclude that Brooks will not be harmed by the issuance of the injunction because he will be paid regardless. However, the court finds from the testimony in regard to the contractual obligations of stations to expose an anchor on its news at certain times that there must be some intrinsic benefit to the performer. The court's own simplistic conclusions would be based on the elderly rubric, "Out of sight, out of mind." The court finds both concepts valid and therefore concludes Brooks would be harmed by the injunction.
In regard to WVIT the court concludes it would suffer a decline in the nefarious Nielsen numbers, the results of which are clearly not quantifiable but would be harmful to that defendant.
In regard to plaintiff, the court makes the same finding of harm as it made in regard to WVIT.
IV. One of the equities a court must balance is that which springs from the rule that contracts that interfere with the interests of the public must be reasonable. New Haven Tobacco Co. v. Perrelli, 11 Conn. App. 636, 638-640; Torrington Creamery, Inc. v. Davenport, 126 Conn. 515, 519.
The areas to be considered in deciding the reasonableness of a restrictive covenant are:
 "(1) the length of time the restriction is to be in effect; (2) the geographical area covered by the restriction; (3) the degree of protection CT Page 2800 afforded to the interest of the party in whose favor the covenant is made; (4) the restrictions imposed on the employee's ability to pursue his occupation; and (5) the potential for undue interference with the interests of the public." id.
This court has already found that the time and area coverage as set out in the Covenant are both reasonable. The court finds that the protection given to plaintiff by the Covenant is reasonable as are the restrictions imposed on Brooks' ability to pursue his chosen work.
The court struggles a bit with whether this injunction against not just a commercial media organization but its news segment might not be an unreasonable interference with the interests and rights of the public under the first amendment to the United States Constitution. Those interests and rights, known as freedom of the press, simply protect against prior restraints on our publication. Near v. Minnesota, 283 U.S. 697, 713, 735. Here we have no prior restraint on the publication of anything, but we do have a possible prior restraint on WVIT of what might be said or shown by Brooks. Although the court finds Brooks different from other humans the court cannot find from the evidence before it that his method of delivery, style, speech patterns, costumes, appearance and facial expressions are so unique that the public would be kept from its rights if he did not appear to deliver the news on WVIT. Brooks may be unique as far as drawing an audience or enhancing a Nielsen rating but not as far as the public's interests and rights to the publication of any material. Thus, the court does not find any prior restraint.
This court does not favor restraints on a human being's right to change employment. Nor does this court favor the deliberate breach of a contract where there are no exigent problems for the employee. Here Brooks will be paid in full. It is only the overt action of WVIT trying to use his anchor image before it fades somewhat that has brought us to this point. If the court were to find a deliberate breach of the contract that would weigh heavily when the court is balancing the equities. It would be as though the defense came with unclean hands.
Defendants have now begun to offer two arguments. First they say the Covenant is not effective because of the fact that plaintiff had a full opportunity under the right of first refusal clause in paragraph 6(c) and did not use it, thus making Brooks CT Page 2801 "free to furnish his on-air services to WVIT." Defendants' Memorandum 25. Secondly they assert that the Covenant is overbroad.
 I. Relationship of Paragraph 6 Subparagraphs
Subparagraph 6(a) is a grant to plaintiff of the exclusive right to use Brooks' image in various forms for sixty (60) days after the end of his employment. WVIT used that image beginning December 12, 1993 at the earliest and January 8, 1994 at the latest.
Subparagraph 6(b) is a promise by Brooks that he will not provide his on-air services to any television station in a designated area for six (7) months after the end of his employment with plaintiff. This promise is clear and distinct.
Subparagraph 6(c) comes in three parts. The first part is in effect a continuation of the subparagraph 6(b) promise. It then goes on to qualify that by the clause "without first giving PNS the [right of first refusal]." The third part comes at the end of the subparagraph which says if plaintiff rejects the proffer under the right of first refusal, "[e]mployee [shall] be free to furnish or agree to furnish the Other Station Employee's on-air services . . ."
It is clear enough that plaintiff and Brooks intended the Covenant in every contract they entered into with one another. What is not yet clear is the intended restraint of the Covenant.
It is true that there is some ambiguity, contradiction and confusion in the three subparagraphs. When we compare them with the language of paragraph 3 of the letter agreement of November 1987 which provides: "Regardless of whether or not we choose to exercise our right of first refusal, you agree not to accept any offer from any competing station as outlined in the attached talent contract clauses" we are forced to completely reassess the paragraph 6 language.
That language from the November 1987 letter is also contained in paragraph (3) of the contract letters of June 8, 1984 and May 20, 1987. A dramatic change comes when we move ahead to the letter of November 9, 1990 where the discussion of non-competition is found in paragraph (4) which reads as follows: CT Page 2802 "Upon the expiration of this agreement, the Station shall have non-competition and first refusal rights in accordance with the attached Talent Contract Clauses." That change is not confusing. That change removes the past "Regardless of whether or not we choose" language entirely from the cover letter. To this court that appears to be a conscious change. It is true that this court has some difficulty in determining the purpose of subparagraph 6(b) in the 1984 Contract, the 1987 Contracts and the 1990 Contract in view of subparagraph 6(c). Because of this the court has given a lot of consideration to the evident intent of the parties in arriving at its interpretation of the 1990 Contract language. Much may be said of the WVIT contract which does not "air" Brooks until the six-month period is over; of the defendant's concern about plaintiff's enforcement intent; and of the defendant's failure to raise the argument about subparagraph 6(c) but it is not enough. The court resolves any doubt it has against the plaintiff drafter.
Application for temporary injunction is denied.
N. O'Neill, J.